IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Respondent,                      No. CR S-03-0104 MCE GGH P

  vs.

CY BROWN,

    Movant.                         <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

*Introduction and Summary*

        Movant Brown ("Brown") has moved pursuant to 28 U.S.C. § 2255 to have his conviction vacated on several grounds, one of which alleges ineffective assistance of trial counsel. Within that claim, Brown charges his trial counsel with urging Brown to commit perjury and testify to a false scenario in lieu of the true actual innocence. None of the claims warrant an evidentiary hearing, and none have merit. Brown also filed supplemental requests to add claims which, with one exception, are either time barred or are not meritorious. However, the government conceded ineffective assistance of counsel on the <u>Ameline</u> remand issue. The undersigned recommends that the § 2255 motion be denied, with the exception of one ineffective assistance claim filed in a supplemental pleading to which the government conceded.

\\\\\

*Procedural Facts*

Brown was indicted on charges (March 6, 2003), arrested and detained on May 3, 2003, and convicted of armed bank robbery (18 U.S. C. § 2113(a), (d)), as well as use of a firearm (18 U.S.C. § 924(c)(1)) (December 17, 2003).  Judgment was entered on March 11, 2004 – 150 months on the robbery count, and a consecutive 84 months on the firearm count.  An appeal was taken on sufficiency of the evidence grounds, a jurisdictional FDIC issue, and a sentencing issue.  The conviction was affirmed in an unpublished opinion, but remanded on the sentencing issue pursuant to United States v. Ameline, 409 F.3d 1073, 1074 (9th Cir. 2005) (en banc).  United States v. Brown, 172 Fed. Appx. 206, 2006 WL 751315 (9th Cir. 2006).  Exercising his option to stand on the original sentence, Brown ultimately determined not to challenge further the original sentence, and stipulated to a vacating of the Ameline remand.  Docket # 93.  He then filed the present § 2255 motion on September 28, 2007 (signed September 15, 2007).

*Issues*

The original motion asserted in Claim 1 that the trial court erred in refusing to order substitute counsel at Brown's request shortly before the trial was to begin; that defense counsel was ineffective for failure to investigate a number of things, and most notably, because defense counsel "compelled" Brown to give up his "true" alibi defense and testify to a fanciful "a drug dealer committed the robbery" scenario, and that appellate counsel was ineffective as well in not raising the substitution of counsel issue.  In two supplemental pleadings filed after the United States opposed petitioner's original motion, Brown alleged that his trial was commenced after the 180 days specified in the Interstate Agreements of Detainers Act, his Ameline counsel was ineffective on re-sentencing, and appellate counsel was ineffective for all the reasons set forth against trial counsel in the initial motion.

\\\\\

\\\\\

*Standards for Evidentiary Hearing*

The standard rule requirement for holding an evidentiary hearing is well established: when a movant posits facts which would demonstrate a violation of federal law or the Constitution, a hearing must be held "'[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" United States v. Mejia-Mesa, 153 F.3d 925, 929 (9th Cir. 1998). Of course, this does not mean that an evidentiary hearing must be held on any baseless assertion by a convicted defendant. Mere conclusory statements asserted without evidentiary support do not warrant a hearing. United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 1993). The district court is entitled to supplement the record and then make its decision without an evidentiary hearing, Shah v. United States, 878 F.2d 1156, 1159 (9th Cir. 1989), and may even utilize common sense in determining whether to hold the hearing. Id. Finally, claims made which are "palpably incredible or patently frivolous" when viewed in light of the entire record are not entitled to an evidentiary hearing. United States v. Schaflander, 743 F.2d 714, 717 (9th Cir.1984). See McElyea v. Schiro, 2009 WL 222375 (D. Ariz. 2009) (finding that petitioner's contrived allegation that he was coerced into perjury by his attorney did not warrant an evidentiary hearing; see also United States v. Wilson, 337 Fed. Appx. 747, 2009 WL 1863680 (10th Cir. 2009) (finding frivolous allegations of coerced perjury).

*Discussion*

Because several of the issues raised deal only with procedural matters, the undersigned will give the facts related to those matters in the first section below. The facts regarding the evidence submitted at trial will be given in Section B.

    A.  Refusal to Substitute Counsel (A Second Time) and Ineffective Assistance of Appellate Counsel

Petitioner had previously maintained that he could not continue with his first appointed counsel (AFD Jeff Staniels), and the court then substituted in Attorney Fred Dawson. Petitioner alleges that communication broke down between this second counsel and himself

because of either a personality conflict or racial animosity.

After one continuance necessitated by the first change of counsel, trial had been set for December 10, 2003, when on November 20, 2003, Brown asked that his second counsel (Dawson) be removed and a third counsel be appointed for him. Brown's counsel initially told the trial judge (the Honorable Morrison England) that there had been an irreconcilable breakdown in his relationship with Brown, and that it was a matter of communication – "[t]ends to be a bit one way in this case." RT (Nov. 20) 5.[1] Brown agreed and stated that although he had no disrespect for Mr. Dawson, the attorney would not listen to him. RT 6. The trial judge explored these initial comments further. Brown related that he was upset because he thought he was being "rushed" to trial. When discussing the matter in camera, Brown desired to attack the *prosecutor's* tactics, RT (Nov. 20) 9-10, and thought the prosecutor's evidence to be deficient. RT (Nov. 20) at 10, 12-14. He also thought that he was being rushed to trial and not given enough time to do his own research and investigation. RT (Nov. 20) 16. In general terms, Brown thought Dawson not to be helping him enough to contest the deficient case.

After further discussion about the procedures in federal court, and the fact that much of Brown's evidentiary problems had to be ultimately decided by the jury, and the fact that there was no guarantee whatsoever that any other attorney would not also have a difficult time with Brown, Brown stated : "I'm going to stick with him. I'm going to take your advice. He's a good lawyer." RT (Nov. 20) 19. Judge England found at this point that there was not an irreconcilable conflict and the motion to substitute counsel was denied. RT (Nov. 20) 19-20.

On the eve of trial, December 9, 2003, Brown made a second request to have Dawson removed. Again it is apparent from the transcript that Brown was anxious about his trial when again asking for substitute counsel.

---

[1] For the purpose of adjudicating this § 2255 motion, the undersigned orders the November 20, 2003 and December 9, 2003 transcripts involving substitution of counsel unsealed. There is no reason at this time to keep the transcripts sealed.

> I came before you last month, and I pleaded my case. Now you said that there wasn't–your feelings was that you didn't feel that there was a break down in communication between us because you seen that I had respect for this man. Now, I'm a Christian. I have to have respect for everyone. I try to. I'm trying to change my life. Now, that doesn't mean that there's not a break down. All we do is argue and yell.
>
> Now the other day, something he said to me kind of hurt me. I don't want to go no farther with this man. I still don't have no disrespect towards him, but this is my life. I'm looking at my– the rest of my life. This is serious.
>
> \*\*\*
>
> He didn't want to talk. I told him please help me with this case. He told me , quote, unquote, get Don Masuda (phonetic) to help you. That's another lawyer that I was talking to pertaining to the first camera motion. He gave me some good input.
>
> And he just threw it in my face, like, you know what I mean? I mean, you're my lawyer. The judge tells us to try to work through this. But still in all, there's a problem.
>
> Now, I mean I'm locked up. This man goes home every day. I know everybody is looking at me like the bad guy, but I am not the bad guy. I am fighting for my life.......

RT (Dec. 9) 4-5.

Brown again thought he was being rushed to trial. RT (Dec. 9) 6. Attorney Dawson agreed (again) that communicating with Brown was difficult, but that "[w]hether I would consider it a complete breakdown or not is another issue. Mr. Brown has some significant philosophical and intellectual problems with the concept of circumstantial evidence and just what it means and how it works...." RT (Dec. 9) 7. Judge England saw this as more of the same difficulties that he had witnessed before at the November 20 hearing, did not believe there was an inability to work together at trial, noted that it was the day before trial, and denied the motion. RT (Dec. 9) 8.

The United States is correct that since the trial error claim was not raised on direct appeal, it was defaulted. See United States v. Ratigan, 351 F.3d 957, 960 (9th Cir. 2003) citing Bousley v. United States, 523 U.S. 614, 118 S.Ct. 1604 (1998). However, Brown clearly raises the issue of substitution in Claim 3 – ineffective assistance of appellate counsel. Since the merits of the denied substitution have to be reviewed in any event for claim 3 for both Strickland

5

prongs, and the same merits would be at issue for Claim 1, and a win on one is all that is required for Brown, the undersigned will simply adjudicate the merits for both claims.

The district court has discretion in reviewing motions to substitute counsel. Three factors are analyzed:

(1) the timeliness of the motion;

(2) adequacy of the judge's inquiry;

(3) whether the problem is so great as to result in a complete breakdown in communication and a consequent inability to prepare a defense.

United States v. Prime, 431 F.3d 1147, 1154 (9th Cir. 2005). Other factors come into play in particular cases. A significant factor is whether substitutions have been granted in the past, and it appears that further substitutions will simply result in more of the same type communication breakdowns. United States v. Mendez-Sanchez, 563 F.3d 935, 943 (9th Cir. 2009). Also, disagreement over litigation tactics is an insufficient reason per se to substitute counsel. United States v. Reyes-Bosque, __F.3d__, 2010 WL 681839 *13 (9th Cir. 2010).

Clearly, Brown's requests came on the eve of trial, after one trial continuance had been given to substitute counsel (Staniels to Dawson). The last request came on the very day before trial. This factor weighs in favor of denial. The district judge wisely gave Brown "the floor" to set forth his disagreements with counsel. Brown's reasons were insightful in that he was primarily angry with the prosecutor, anxious about going to trial in an admittedly serious case, and was very strong in his beliefs about how the case should be tried. His litigation disagreements with counsel were the primary reasons for the "yelling" sessions. Finally, the trial judge clearly determined that a substitution of counsel at that late date would simply lead (again) to more of the same type communication problems. The inquiry was adequate. Moreover, the trial judge reasonably determined that no complete breakdown had occurred which was obvious given Brown's repeated statements of "respect" for Dawson's abilities as a lawyer.

\\\\\

1    It is true that Mr. Dawson on November 20 stated his belief that communications had broken down, although he was a little less sure of it on the day before trial. The trial judge here had to determine whether counsel wanted out of a difficult case from the defense standpoint made much worse by a difficult client who would test any lawyer as opposed to simply being unable to work with the client. This case was a mix of the two, and the trial judge came out on the correct side of the equation.

Brown now states that a complete breakdown had occurred because counsel used a racial epithet when referring to Brown during a presumed argument, and that this comment was obliquely referenced at the December 9 hearing when Brown stated that a comment by Dawson had "hurt" him. Normally, at the very least, an evidentiary hearing would be necessary to ferret out the truth because such statements by counsel, if made, may well demonstrate a complete, indeed, destructive breakdown in communications and counsel's ability to be a professional and energetic advocate. Such a comment, if made, might well warrant discipline against the lawyer. Brown correctly cites Frazer v. United States, 18 F.3d 778, 784 (9th Cir. 1994).

However, in the unique aspects of this case, an evidentiary hearing is not warranted because the assertion of a racial epithet is palpably incredible. This is so for several reasons. First, it is not believable that such a comment could have been made, and not specifically referenced at the December 9 hearing. Brown was not a shy, retiring type; he loudly made his complaints known. The only specific comment referenced at the December 9 hearing was the "tell it to Masuda" comment that followed Brown's statement about a hurtful comment. Secondly, the comment, if made, is entirely belied by Brown's statements at *both* hearings that he "respected" his counsel. No forthright person would set forth such "respect" statements, especially at a hearing after the alleged statement was made, if a such a degrading comment had been made. Thirdly – and significantly – Brown engaged in an *admitted perjury* of nearly his entire direct testimony. Motion at 5e of 6, Traverse at 4, and the direct testimony where Brown testified to the perjury, RT 319-330. The complete fabrication of "BJ the drug dealer did it," and

Brown's willingness to engage in perjury, robs Brown's latter day assertion of any possible credibility on any contested matter. In addition, the "I was in Washington state at the time" alibi initially proffered by Brown as his potential testimony, and resurrected for this § 2255 motion, had to be discarded before trial because of its equal lack of believability. Hammond Declaration. It appears that Brown will say whatever might seem advantageous to him regardless of the truth.

Other reasons exist, as well, which would make an evidentiary hearing useless in light of the above facts. Brown does not relate that any other witness heard the asserted epithet. Attorney Dawson has filed a declaration stating that no epithet was ever made. Thus, the hearing would be simply a credibility contest – one that Brown is sure to lose given his past history.

Finally, the claims involving substitution of attorney based on new facts do not lend themselves to adjudication here. The straight "trial court error" claim cannot be decided on new facts outside the record. Neither can the ineffective assistance of appellate counsel claim be easily reviewed because appellate counsel would only have the record to deal with on direct appeal. It was not ineffective for appellate counsel to not raise the issue on direct appeal given the record. See discussion above.

For all of the above reasons, Brown's claims based on the trial court's refusal to appoint him a third, substituted attorney do not warrant an evidentiary hearing and should be denied.

B. Ineffective Assistance of Trial Counsel

Asking this court to review nearly everything that his counsel did or did not do, Brown believes that one or more of these errors warrant a retrial. Despite the acquiescence of the United States to an evidentiary hearing on one claim, none of the claims warrant an evidentiary hearing and should be denied.

Before reviewing each sub-claim, the facts of the case need to be set forth. The undersigned has reviewed the entire transcript, and finds the statement of facts set forth by the government in its answer to be accurate. The court will repeat those facts here verbatim with a

few additions. The facts are set forth in detail to demonstrate that Brown's ineffective assistance of counsel assertions, discussed below, are palpably incredible.

1. *Facts*

Around 6:50 p.m. on September 9, 2000, shortly before closing time, the defendant walked up to the counter of a Wells Fargo branch bank in Sacramento. R.T. 6, 8. The branch was a small two-person operation inside an Albertson's supermarket. R.T. 6. The defendant pointed his gun at one of the two tellers and said, "Give me the money." R.T. 7-8, 23; Govt. Exh. 1. He had his finger on the trigger and both employees were afraid they would be killed. Id.; R.T. 24. There were three customers at the counter, all of whom quickly disappeared into the store. Id.; Govt. Exhs. 4, 5.

One of the tellers gave the defendant all of his $100 bills, but the defendant was not satisfied and demanded all of the money. R.T. 9. The teller then put the rest of the money, including the change, into the defendant's backpack. R.T. 9, 26. The robbery proceeds totaled about $9,000.00. R.T. 21. The teller also put bait money and a tracking device called a RAM tag into the pack. Id. The RAM tag triggered a silent alarm. Id.

The defendant was wearing what a teller described as a full-body mechanics suit. R.T. 10. He also wore sunglasses, a blue cloth that went over his mouth but under his nose, a hat, a wig, and gloves. R.T. 15, 19, 24. [The clothing/disguise worn by the robber was clearly shown in bank photographs.  RT 11]  At one point, the other teller put her hands down on her legs. R.T. 24. The defendant, apparently thinking she was reaching for the alarm, said, "Don't think about pushing the alarm" and pointed the gun at her. Id.

When the defendant left the bank, he got on a dark-colored mountain bike and pedaled away. A security guard chased him and, although the guard lost sight of him for a moment, he quickly found him again standing next to a truck. R.T. 33-34. When the guard got within a couple of car lengths from the defendant, the defendant saw him, told him to "get the fuck back," and pointed a gun at him. R.T. 34-35. The security guard took cover behind a nearby car as the defendant got into the truck and drove off. R.T. 35. The defendant told the security guard to "get the fuck back" once more as he drove away. Id.
At first the guard was unable to find the bike the defendant had used. R.T. 38. The truck had been parked next to a brick wall, however, and the bike was found on the other side of the wall where the defendant had thrown it. Id.; Govt. Exh. 32. On the ground where the truck had been parked, the guard found a black glove. R.T. 39; Govt. Exhs. 29-31.

The money the defendant had taken contained a RAM tag, an electronic device whose location police can track. R.T. 61. When Sheriff's officers located the RAM tag, they found a bundle of items in the bushes in front of a house. R.T. 61-62; Govt. Exhs. 42-44. Balled up around the bag was a jumpsuit, some size 13 boots, a hat with a wig in it, and a black nylon do-rag. R.T. 61-62, 71; Govt. Exhs. 47-48. A truck matching the description of the one used in the robbery was parked in front of the house. R.T. 63. A pair of sunglasses was found on the

lawn nearby. R.T. 69. Govt. Exh. 43. The robbery money [about $9,600] and the gun used in the robbery were found in a backpack at the same place. R.T. 6263; Govt. Exhs. 45-46. [Evidently, the store security guard chasing the robber had disrupted the plans of the robber, and much evidence connected with the robbery, including the money, was left behind.]

When the truck was searched, the police found a black glove matching the one recovered near the scene of the robbery, a blue cloth, and a pair of shoes. R.T. 239; Govt. Exhs. 52, 53.

The truck used in the robbery belonged to Chrisanto (Christine) Lewis and the defendant was staying at her house at the time of the robbery. R.T. 122, 124. Ms. Lewis's sister had a child by the defendant and the child was also staying with Ms. Lewis at the time. R.T. 123-24. Ms. Lewis's house was about a ten minute drive from the Albertson's where the robbery took place and she had been to that store with the defendant. R.T. 129. Early in the evening on the day of the robbery, she had loaned the defendant her pickup truck. R.T. 126-27. The defendant said that he wanted to use it to carry some material to his girlfriend's house so he could do some work there. R.T. 127. He never brought it back. R.T. 128.

At the time of the robbery, the defendant was dating Erma Olivo and doing work at her house for her. R.T. 136. In addition to paying him for the work he did, Ms. Olivo bought things for him from time to time. R.T. 138. One of the things she bought for him was a pair of work boots that she got at Famous Footwear. Id. The boots that were found with the robbery money and the gun were size 13 and had come from Famous Footwear. R.T. 94, 309-10. The defendant wore size 13 shoes. R.T. 106.
Ms. Olivo also remembered that, at the time of the robbery, the defendant had been discouraged and frustrated at his inability to get work. R.T. 144. He told her that if he ever committed another crime it would be a bank robbery because it would get him "good money" and get him back on his feet. Id.

DNA testing was done on some of the items recovered from the robbery. The result for the hat showed that, while it contained the DNA of some individuals, none of them were the defendant. R.T. 173. The test result for the DNA on the gloves did not exclude the defendant, but fit so many people that it did not carry much weight. R.T. 174-76. The black nylon do-rag, however, contained DNA that showed the odds of a match from a random individual from the black population were 1 in 7,300, 1 in 1,300 from the Caucasion or Southeastern Hispanic populations, and 1 in 1,100 from the Southwestern Hispanic population. R.T. 176-77. The blue cloth produced a more conclusive analysis with odds of 1 in 100,000 from the black population, 1 in 15,000 for the Caucasion population, and 1 in 13,000 and 1 in 7,000 for the two Hispanic populations. R.T. 180. [The Ninth Circuit on direct appeal concluded that the DNA "matched" Brown for these items. United States v. Cy Brown, 2006 WL 751315 at *1.]

Before the trial, the defendant filed a notice of intent to offer an alibi defense. C.R. 12. At trial, however, he took the stand and offered a different defense. According to the defendant, he had a long-standing drug problem. R.T. 321. He had been staying at Ms. Lewis' house for two or three months at the time of the

robbery and had borrowed her truck to get drugs. R.T. 323. He said he agreed to loan the truck to a drug-dealer known to him only as "B.J." who was going to use it for an hour and then bring it back. Id. B.J. supposedly gave him three rocks of cocaine but never brought the truck back. R.T. 324. After smoking the rock cocaine, the defendant supposedly walked back to the park where he had given the truck to B.J., but could not find him or the truck. R.T. 325. A woman there told him that the police were at Ms. Lewis' house looking for him. Id.

He was on parole and realized that he was in trouble, so he walked around the neighborhood instead of going back to Ms. Lewis' house and slept under a bridge. R.T. 325-26. The next morning, he went over to Ms. Lewis' house and saw the police there. R.T. 326. Later in the day, he hitched a ride to Stockton. R.T. 326.

The defendant explained that he had borrowed the truck several times to do work at Erma Olivo's house and had left some of his clothing in the truck, including a black nylon "wave cap," and perhaps his boots. R.T. 326-27. He had used the blue cloth on which his DNA had been found to wipe dew off the windows of the truck in the mornings. R.T. 327.

[*Brown admits now that his "B.J." testimony was perjurious*.]

On cross-examination, the defendant admitted that he had a 1992 felony conviction for possession of a narcotic substance, a 1996 felony conviction for second degree robbery involving the use of a weapon, and a 2001 felony robbery conviction. R.T. 336.

Nine months after the [Sacramento] robbery, the defendant was arrested in Yakima, Washington [for a robbery of a Baskins-Robbins store]. R.T. 286. During the time between the [Sacramento] robbery and his arrest, the defendant used false names and social security numbers. R.T. 339-43.

### 2. Standards for Ineffective Assistance of Counsel

The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at 690, 104 S. Ct. at 2066. The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id., 104 S. Ct. at 2066. "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised

11

acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at 693, 104 S. Ct. at 2067. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id., 104 S. Ct. at 2068.

### 3. Assertions

#### a. Alibi Defense (Including Contact of Washington Witnesses)

Brown contends that his counsel was ineffective in various regards, but most notably in his assertion that his counsel urged or coerced him into giving up his alibi defense – Brown was in Washington state at the time of the robbery – and instead had him testify to the perjurious "B.J. did it" defense. Brown says that if only the Washington witnesses (Colleen Brown and Linda Peterson) had been contacted, his alibi defense would have worked. Brown's latter day assertions are palpably incredible.[2]

First, Brown produces *nothing* objective in support of his motion's incredible claim, not a latter day witness statement, letter, bill – nothing. This lack of support, combined with the factors below, is telling about the lack of credibility of this alibi.

Secondly, and again, petitioner thought little of testifying to a complete fabrication under oath before the jury. Nothing suggests here that he is not again attempting the same. Petitioner frames his assertions in such a way that he is essentially seeking a retrial, i.e., we know the "B.J." story did not work; let's try the Washington state alibi now. He also frames his assertions such that every significant fact is simply a "take my word for it."

---

[2] There is no doubt that Brown ultimately wound up in Washington after the Sacramento Wells Fargo robbery as he was arrested and convicted for a robbery of Baskins-Robbins store in Washington. It is the timing of his appearance in Washington that Brown would hope to use.

Thirdly, Brown appears to assume in his motion that the Washington witnesses were not contacted. Of course, he knows at the time of his traverse that they were contacted as the government had attached copies of the defense investigation in that respect. As evidenced by the Hammond investigation conducted prior to the time Brown went to trial, after he had obtained non-precise information from the two Washington witnesses about the timing of Brown's presence in Washington, and then *in*culpatory information from Reina Brown (sister of Brown), and after FBI interviews of these witnesses, "it became clear that they would not be helpful to Cy Brown." Hammond Declaration at 1. Indeed, Reina Brown's statement placed Brown in Sacramento just *after* the robbery at the time he asked Reina to drive him to Stockton *from* Sacramento. While it is true that an alibi pleading was filed nearly immediately after the investigator's trip to Washington, it did indeed "become clear" that the alibi was meritless.[3] As the government observes, an attorney's decision not to rely on the bogus alibi defense could not be considered ineffective.

In addition, the evidence at trial when taken as a whole was overwhelming. Brown resembled the robber; he had borrowed from Christine Lewis, just prior to the robbery, the truck unquestionably involved in the robbery. Brown had never indicated to anyone that he would be leaving Sacramento unannounced. His clothing was that identified in the robbery, and

---

[3] The undersigned has closely reviewed the Colleen Brown (no relation to Brown) and Linda Peterson statements. The witnesses did place Brown in Washington at or about the time of the robbery, but they were unsure about the precise date. Also, Brown had told these witnesses a tale about why he was in Washington in the first place – his being sought on a "probation" violation caused by his beating up a person who had molested his son. His California parole officer testified at trial, and did not mention such an event or violation occurring at the time. RT 310-313. Indeed, all the parole officer testified-to was that Brown had been reporting to him regularly, and after the robbery, simply stopped reporting to him. Id. Brown himself testified that he did not know why the police may have been looking for him when he left town. RT 335-336. Brown produces no latter day corroboration for this tale, and again, it shows his propensity to fabricate. Furthermore, for someone "not involved at all in the Sacramento robbery," and for someone who was over 1000 miles away the time of the robbery, Brown was able to relate to Colleen Brown and Peterson, while he was in jail for yet another robbery committed in Washington after Brown had finally arrived in that state as a fugitive, that "his" truck had been involved in the Sacramento robbery, and that his "bag" was in the truck.

was, for the most part, inextricably linked to him through his DNA.  Brown had indicated, if only in a joking manner at a time fairly proximate to the robbery, that he would commit a bank robbery.  The boots found with the fruits of the crime and other robbery evidence were Brown's size, and were derived from the Famous Footwear store connected with the testified-to gift of such boots to Brown.

      Finally, Brown cannot reasonably explain why his lawyer would lie in a sworn declaration to this court that he never engaged in fabricating a story for the purpose of Brown's testimony.  As Brown said to the district judge – no matter what happened in the trial, Dawson went home every night.  Dawson would have had absolutely no incentive to dishonor the profession he had practiced for so many years by substituting one unbelievable story for another.  The investigator (Hammond) has submitted a declaration attached to the answer about his efforts to support petitioner's initial alibi – these efforts, including interviewing supposed witnesses to Brown's presence, ultimately revealed nothing that would support Brown in any significant manner.  As observed above, the investigation would have hurt Brown.  Most importantly, if there were any merit to the alibi, it would be beyond reason why Dawson would give up a possible alibi defense to put on the "'B.J.' did it defense."

      Even if the court were to find the incredible, i.e., that Dawson told Brown to lie in testifying to the BJ story, his claimed prejudice would be that he did not get to testify to perjury #2, which in hindsight, appeals to him more than the perjury # 1 to which he did testify.  Given the record, there is not a possibility that this perjury #2 story, which actually concluded in yet another, subsequent robbery by Brown (the Baskin-Robbins robbery), would be received favorably by any trier of fact.[4]

\\\\\\

---

[4]Although the Washington Baskin-Robbins robbery was subsequent to the Sacramento Wells Fargo robbery, Brown was convicted and impeached with this robbery conviction at the trial at issue here.

In sum, the undersigned cannot conclude that Brown's desperate "Hail Mary" alibi is anything other than a last second attempt which cannot be completed in any credible way. The undersigned will not expend the taxpayer's money in appointing counsel and going through the motions of an evidentiary hearing to arrive at the very same result.

### b. Impeachment of Christine Lewis [5]

Knowing that Lewis damaged every defense Brown might be able to postulate, he now criticizes his counsel for not impeaching her with the "known" fact that Lewis was an ex-Brown jilted lover. At trial. Lewis testified:

Q. How long have you known Mr. Brown for, approximately?

A. About 20 years.

Q. And how do you know Mr.Brown?

A. He's my nephew's father.

Q. So your sister is the mother of the–

A. Correct.

\*\*\*

Q. Were you ever involved, did you ever date or ever involved in an intimate relationship with Mr. Brown?

A. No.

RT 123.

Brown now asserts his counsel was ineffective because he told his counsel that he had an affair with Ms. Lewis, she felt jilted, and thus, the testimony that she had loaned Brown her truck just before the robbery ostensibly might have been fabricated. Of course, Brown did

---

[5] Brown faults his counsel for not contacting Lewis (the person with whom petitioner was living and the person from whom Brown borrowed the truck according to the Lewis testimony). He does not in Ground 2 identify anything this contact would have developed. In Ground 1, Brown claims that he had an affair with Lewis, and that she was angry because he was later having an affair with someone else. The undersigned supposes that Brown is attacking his counsel for not impeaching Lewis with this assertion.

not relate any of this on his direct testimony, and admitted he had borrowed the truck.  RT 320. Again, Brown simply makes this latter day assertion inconsistent with his sworn trial testimony and asks for an evidentiary hearing.  None will be forthcoming.

### c. Miscellaneous Claims

Brown claims that his counsel did not obtain phone records which ostensibly would have shown that he was in Washington at the time of the murder.  As detailed by the investigator Hammond, no such records could be obtained as Brown was a fugitive without a phone in his name, or alias.  Moreover, Brown presents nothing which might prove something to the contrary.

Counsel is also attacked for not challenging Brown's priors which were used to impeach him and used for sentencing.  Brown does not suggest why these priors were not valid convictions; he certainly does not allege that he was denied counsel for these previous criminal adjudications.  Brown's claim is conclusory and ineffective.  See also Custis v. United States, 511 U.S. 485, 497, 114 S.Ct. 1732 (1994) (no right to attack priors used to enhance sentencing unless occasioned by the lack of counsel); United States v. Gutierrez-Cervantes, 132 F.3d 460, 462 (9th Cir. 1997) (no right to collateral attack on convictions except on basis of denial of counsel even where the prior conviction was an element of the crime).

Brown challenges his attorney's lack of objection to the prosecutor's question whether Brown had admitted to Marie Brown that he had committed the robbery.  RT 339.  The question itself is not objectionable, as pointed out by the government because it sought an admission which would have been valid under the rules of evidence.  Fed. R. Ev. 801(d)(2). While this issue may be complicated if the prosecutor had no good faith basis for asking the question, Brown does not produce any evidence that the prosecutor lacked such.  And, as the government also points out, defense counsel's practice in just letting the witness answer, "no," may well have been far better than making a spectacle of the issue (assuming Brown had never told Marie Brown about the robbery).

Petitioner's remaining contentions of ineffective assistance involving the blue cloth and "do-rag" are frivolous for the reasons set forth in the Answer.

### C. Ineffective Assistance of Appellate Counsel

Brown claimed initially in his Motion that his appellate counsel was ineffective because he failed to raise the substitution of counsel claim. Because the undersigned has found that Brown's legal claim on the substitution of counsel argument is without merit, it cannot have been ineffective assistance of appellate counsel to have failed to raise this claim on appeal.

### D. Supplemental Claims

On September 8 and 15, 2008, Brown filed requests to add supplemental claims to his Motion. The first request sought to add a violation of the Interstate Agreements on Detainers Act (IADA), 18 USC App. 2, and an ineffective assistance of counsel claim – this time at his re-sentencing. The September 25, 2008 request attempts to add ineffective assistance of counsel claims for all of the grounds raised in the initial Motion.

For the reasons set forth below, all of the supplemental claims in the September 8 request are time barred. However, the government expressly did not oppose the re-sentencing ineffective assistance claim.

As set forth in the facts above, Brown's appeal resulted in an affirmance and a Ameline remand.[6] On October 8, 2008, a somewhat harried AUSA responded to the Ameline ineffective assistance with, in essence, a "go ahead-- make my day" non-opposition. While the undersigned disagrees with this tactic, he will not override this conscious choice and will recommend a grant on this issue so that Brown can have a third sentencing.

\\\\\

\\\\\

---

[6] United States v. Ameline, 409 F.3d 1073, 1077-78 (9th Cir. 2005) (en banc) (remand for the purpose of the district court's determining "whether it would have imposed a different sentence had it understood that the Guidelines were advisory.")

17

The IADA issue is another matter.  The government opposes the request to supplement based on its tardiness under Fed. R. Civ. P. 15.  However, in habeas cases, an attempt to amend or supplement is almost never found tardy based on a Fed. R. Civ. P. 15 due to the "once and for all" philosophy for including all claims in the first habeas process.  That is, if all of the claims can be determined in one proceeding, they will be, rather than have successive petitions filed at a later time.  Nevertheless, because the government has raised a timeliness issue, albeit in a different context than the AEDPA limitations statute, the undersigned will exercise his discretion to undertake the limitations analysis *sua sponte*.  The undersigned may determine the applicability of the AEDPA statute of limitations on his own motion.  Day v. McDonough, 547 U.S. 198, 209, 126 S.Ct. 1675, 1684 (2006).[7]

Federal defendants have one year from several triggering events to bring a habeas motion to review matters outside the record which may require a grant of the motion (petition).  28 U.S.C. § 2255(f).  The only triggering date of consequence here is the one that commences the one year period of limitations "the date on which the conviction becomes final."  In this case, because the direct appeal was remanded on Ameline grounds, the conviction became "final" for habeas purposes upon completion of the remand proceedings, and generally, for the 30 day period in which to again seek review in the Ninth Circuit.  United States v. Lafromboise, 427 F.3d 680, 684 (9th Cir. 2005).  However, as reflected by the docket, the parties eventually stipulated to a vacating of the remand proceedings with an agreement that the original sentence was the one to be imposed, in essence, reinstating the original judgment.  That stipulation was filed August 15, 2006.  Since the parties agreed to the result, there could be no appeal of the issue.

\\\\\

---

[7] It may be that the entire Motion is barred by the statute of limitations for § 2255 cases, but the government never argued that the initial Motion was untimely in any way.  The undersigned will not go so far as to raise the limitations issue *sua sponte* for the entire Motion, and the untimeliness of the initial Motion is somewhat in doubt.

This case is different from what actually transpired in the Lafromboise case. There, the case was remanded after several counts were reversed, and a re-trial was contemplated. The government determined to dismiss the remanded charges, and the record ended with the dismissal. No re-sentencing was undertaken with just the affirmed counts in consideration. The Ninth Circuit held that since the original judgment remained in error, i.e., the defective counts remained in the judgment with sentences, an amended judgment had to be entered. Without a correct judgment in the file, the one year period never commenced running.

Here, however, once the parties vacated the Ameline remand by stipulation, there was no amended judgment to enter. Brown agreed to be bound by the original judgment which was again the effective judgment. Brown had one year from that date in which to file his § 2255 motion. He did not file the motion until September 28, 2007 (signed September 15, 2007). Giving Brown the benefit of the doubt that he dropped the Motion in the prison mailbox on the date he signed it, and that he would be eligible for the 30 day appeal period after stipulating to the original judgment (doubtful), the initial Motion would be timely if brought on or before October 14, 2007. However, for the September 2008 supplemental claims to be timely, they *must* relate back to a timely filed claim, i.e., be derived from the same core of facts as a claim timely brought. Felix v. Mayle, 545 U.S. 644, 657, 125 S.Ct. 2562 (2005). Obviously a claim involving the IADA did not relate at all to the claims in the initial Motion. See e.g., Valdovinos v. McGrath, 2010 WL 789536 (9th Cir. 2010). Thus, the claim is not timely.[8]

---

[8] Nor does it appear that the claim would be meritorious either brought as a straight claim, or one brought through the filter of ineffective assistance of counsel. The only detainer produced by Brown that was signed by him and "delivered to the warden" thereby, was the one which Brown signed on January 22, 2003. The signature and delivery are mandatory prequisites for the commencement of the 180 days to trial period. 18 U.S.C. App. 2 Article III. However, time tolled under the Speedy Trial Act due to defendant requests are also tolled under the IADA. United States v. Johnson, 953 F.3d 1167, 1172 (9th Cir. 1992). After defendant appeared in this district to commence proceedings, the Speedy Trial Act was tolled commencing with May 20, 2003, based on defense counsel's need for time to prepare, and later for motions, all the way through the day before trial with the exception of 16 days from November 4, 2003-November 20, 2003. The government beat the Article III, 180 day clock by a few days.

The claim filed on September 25, 2008, is an ineffective assistance of counsel claim which seeks to incorporate *all* of the claims raised in the initial motion instead of just the one. These claims would arise from a common core of facts of timely claims, and hence would be timely themselves. However, because the initial claims were not meritorious, Brown cannot claim that his appellate counsel should have raised them – he was not prejudiced as a matter of law.

Thus, with the exception of the conceded claim, the supplemental claims are either barred or have no merit.

*Conclusion*

IT IS HEREBY ORDERED that no evidentiary hearing will be held;

IT IS HEREBY RECOMMENDED that the motion (docket # 96) and the supplemental motions (docket #s 114, 115) be denied with the exception of Brown's ineffective assistance of Ameline remand counsel; due to the concession of the United States, Brown should be given a third sentencing hearing.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time waives the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 04/05/2010

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

GGH:ggh:035
brown104.257